**HAVEPOWER, LLC**

v.

**GENERAL ELECTRIC CO., et al.**

**No. CIV.A. DKC 2001–0353.**

United States District Court,
D. Maryland.

Jan. 24, 2002.

Leslie K. Dellon, Lepon, McCarthy, White & Holzworth, PLLC, Washington, DC, for plaintiff.

James L. Thompson, Joseph P. Suntum, Maury S. Epner, Miller, Miller & Canby, Rockville, MD, for defendants.

## *MEMORANDUM OPINION*

CHASANOW, District Judge.

Plaintiff havePOWER, LLC asserts that General Electric Fuel Cell Systems ("GE Fuel Cell Systems" or "GEFCS") breached their distribution contract and violated Maryland Antitrust laws. havePOWER asserts that GE Fuel Cell Systems' parent company General Electric ("GE") induced GE Fuel Cell Systems to breach its contract and violated Maryland Antitrust laws by merging with Honeywell. Pending before the court and ready for resolution is the motion by Defendants General Electric Fuel Cell Systems and General Electric to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)

on the grounds that havePOWER failed to state any actionable claims. No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6. For the reasons that follow, the court shall grant the motion in part and deny it in part.

## I. Background

The following recitation is taken from facts alleged in Plaintiff's complaint. This case arises out of a dispute over an alleged exclusive distributorship agreement between havePOWER and GE Fuel Cell Systems, LLC, to sell fuel cells in the Washington, DC, Maryland and Northern Virginia region.[1] Fuel cell electric generators produce direct electric current that can be converted to alternating current for use by homes and industries. havePOWER was established as a division of Chesapeake Design, LLC, a Maryland company, in 1998. It became a District of Columbia limited liability company in December 1999 and was reformed as a Maryland limited liability company in August 2000. In February 1999, GE Power Systems formed GE Fuel Cell Systems to market and distribute fuel cells designed and manufactured by Plug Power, Inc. GE Fuel Cell Systems is co-owned by GE (75% share) and Plug Power, Inc. (25% share). GE Fuel Cell Systems owns the worldwide marketing and distribution rights, except for four Midwestern states, for all Plug Power fuel cell generators of up to 35 kW generating capacity. It has contracted with third parties to license the distribution, service, installation and maintenance of fuel cell systems worldwide.

On October 28, 1999, havePOWER completed an on-line application on a website to become a Distributor, Installer, and

---

**1.** The complaint refers to several entities, including GEMicroGen, Inc. and Plug Power, Inc., as well as the Defendants. The complaint does not set forth the alleged relationships among all of the entities.

Servicer of Plug Power fuel cells. On November 16, 1999, havePOWER received a response advising it that a representative would contact havePOWER shortly. Jay Zawatsky, Chief Executive Officer of havePOWER, e-mailed Laura Chummers of GE MicroGen on January 6, 2000 to notify her that havePOWER had not yet received a response to its dealer application filed in early November. The next day, January 7, 2000, Zawatsky received a phone call from Richard Robertson, Director of North American Market Development for GE MicroGen, Inc., who outlined five capabilities havePOWER would need to demonstrate in order to become an exclusive distributor for GE's fuel cell products. These were: (1) management and installation capability; (2) financial capability; (3) a source of fuel through a strategic alliance withe a natural gas/propane supplier; (4) market presence; and (5) a vision for the future of fuel cells. He also stated that an exclusive distributor must pay a fee between $200,000 and $2,000,000 to purchase the distributorship, purchase 10 commercial fuel cell units at a unit price of $35,000, and meet mandatory annual sales quotas ranging from 300 to 2,000 fuel cells at a unit price of $8,000.

In order to comply with those prerequisites, havePOWER secured a supply of natural gas and propane from Power-Trust, signing a letter of intent on February 11, 2000. On February 15, 2000, havePOWER's executives met with Robertson at GE Fuel Cell Systems headquarters in New York and presented a strategic plan outlining their company profile and their capability to be an exclusive distributor, installer, and servicer. At the close of havePOWER's presentation, Robertson stated that GE Fuel Cell Systems would negotiate with havePOWER to become the exclusive GE Fuel Cell Systems fuel cell distributor, installer, and servicer in almost all of Maryland, the District of Columbia and Northern Virginia.

As a precondition to GE Fuel Cell's issuance of a Memorandum of Understanding, havePOWER executed a Confidential Information Agreement (CIA) on March 12, 2000 and faxed it to Robertson. havePOWER states this was not signed by GEFCS and has submitted a copy of the CIA. Paper No. 2, Ex. A.

Robertson informed Zawatsky on March 21, 2000 that negotiation of a definitive Distributor Agreement would begin soon. Zawatsky returned a signed copy of the Memorandum of Understanding (MOU) to Robertson on March 23, 2000. Robertson faxed a draft definitive Distributor Agreement to Zawatsky on March 31, 2000. The parties began to negotiate the terms of the Agreement and havePOWER asserts that during the negotiations Robertson "held himself out as having actual authority to negotiate the terms". Paper No. 2, ¶ 38. havePOWER states that both Robertson and Glickman, President of GEFCS, had the authority to bind GEFCS because Glickman expressly represented to havePOWER at a meeting on May 4, 2000 that Robertson had the authority to speak for GEFCS and to contract with havePOWER. Paper No. 2, ¶ 41. havePOWER asserts that this authority is what it relied on in its dealings with GEFCS and its own potential clients. It also asserts that Robertson's assurances form the basis of a contract between GEFCS and havePOWER.

During that May 4 meeting, Glickman, Robertson, and Zawatsky discussed a potential deal where havePOWER would sell fuel cells to Native American tribes. On July 11, 2000, Robertson represented to havePOWER that fuel cell sales to tribes could be brokered by havePOWER and that those would be counted towards the quota requirements in the Distributor

Agreement which was being negotiated. Robertson sent two final copies of the Agreement to havePOWER on July 24, 2000, asking that they be returned to GEFCS for Glickman's signature "later this week". Paper No. 2, ¶ 55. These were returned signed, along with a check for $750,000, the following day.

On August 17, 2000, Robertson asked Zawatsky for the havePOWER logo, to be used in an advertisement announcing the appointment of a new group of fuel cell distributors. Zawatsky reminded Robertson that the logo would not be finalized until havePOWER's receipt of the final, executed Distributor Agreement. Robertson assured Zawatsky that the execution of the Agreement was a "mere formality" and verbally confirmed to Zawatsky that they had a deal. Paper No. 2, ¶ 58–64. From that point on, havePOWER asserts that it relied on Robertson's representation that the deal was complete.[2]

Following that exchange, Robertson made a trip to havePOWER to meet with potential havePOWER clients from the National Congress of American Indians on September 21, 2000. During that meeting, havePOWER asserts that Robertson represented to havePOWER's potential clients that it was one of the exclusive distributors for GE Fuel Cell Systems. havePOWER continued its marketing efforts until Robertson notified Zawatsky on October 23, 2000 that GEFCS would not be honoring the Distributor Agreement as a result of GE's merger with Honeywell. It is undisputed that the $750,000 check tendered to GEFCS was not negotiated.

A video teleconference was held on October 25, in which havePOWER alleges that Robertson admits GEFCS and havePOWER had entered into an exclusive contractual relationship.[3]

havePOWER asserts that, despite the fact that GEFCS was not interested in pursuing an exclusive distributorship contract with it, it contacted havePOWER's references during November. GE and GEFCS then terminated all negotiations with havePOWER on December 1, 2000.

havePOWER filed this complaint against GE and GEFCS alleging breach of contract, inducement of breach of contract, promissory estoppel and antitrust violations in the Circuit Court for Montgomery County on December 29, 2000. Defendants removed the case to this court on February 7, 2001.

## II. Standard

A Rule 12(b)(6) challenge requires a court to accept all well-pled allegations of the complaint as true and to construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir.1997). Such a motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court, however, need not accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir.1989),

---

**2.** GEFCS disputes this, stating that havePOWER knew Robertson was not authorized to bind GEFCS and the $750,000 check was never negotiated by GEFCS, which is evidence that the deal was not complete. Further, GEFCS asserts that even if they were entitled to rely on Robertson's representation, that reliance was improper after August 29,

based on a August 30 e-mail from havePOWER to GEFCS, referencing a conversation the previous day.

**3.** GEFCS asserts that it offered a non-exclusive distributorship to havePOWER, but it rejected that arrangement.

or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979). Nevertheless, neither vagueness nor lack of detail is a sufficient ground on which to grant a motion to dismiss. *Hill v. Shell Oil Co.,* 78 F.Supp.2d 764, 775 (N.D.Ill.1999) (quoting *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985)).

## III. Analysis

### A. Claims against General Electric ("GE")

#### 1. Tortious Interference with Contractual Relations/Tortious Interference with Prospective Advantage

In Count I of its complaint, havePOWER alleges that GE, a third party, tortiously interfered with its contract with GEFCS. The elements of tortious interference with contract under Maryland law are:

(1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.

*Fowler v. Printers II, Inc.,* 89 Md.App. 448, 598 A.2d 794, 802 (1991) (internal citations omitted). In order to prove the third element of the tort, plaintiff must prove that "the interference was wrongful and without justification." *Sharrow v. State Farm Mutual Automobile Ins. Co.,* 306 Md. 754, 511 A.2d 492, 498 (1986) (citing *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1908)). havePOWER has not sufficiently alleged that GE's actions were wrongful and without justification. *See Sharrow,* 511 A.2d at 498. In fact, havePOWER has alleged that GE

merged with Honeywell in order to become more competitive in the area of fuel cell distribution which is an economic justification and is not wrongful. Because havePOWER has not adequately alleged the third element of the tort of interference with contract, Count I is dismissed.

In Count II of its complaint, havePOWER alleges that GE, a third party, tortiously interfered with the business relationship between GEFCS and havePOWER. In Maryland, the elements of tortious interference with business relationships are very similar to the elements of interference with contract. They are:

(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Natural Design, Inc. v. The Rouse Co.,* 302 Md. 47, 485 A.2d 663, 675 (1984) (citing *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909) (quoting from *Walker v. Cronin,* 107 Mass. 555 (1871))). havePOWER has not adequately alleged facts that indicate that GE acted out of malice by forming an agreement with Honeywell that led to the end of the relationship between GEFCS and havePOWER. Malice "means legal malice . . ., and that . . . means 'a wrongful act done intentionally without just cause or excuse.'" *Id.* (citing *McCarter v. Chamber of Commerce,* 126 Md. 131, 94 A. 541 (1915)). If the interference with the business relationship is "incidental", not "intentional" there is no adequate ground to allege this tort. *K & K Mgmt., Inc. v. Lee,* 316 Md. 137, 557 A.2d 965, 978 (App.1989). Inasmuch as GE's merger with Honeywell suffices as just cause and has created only an incidental interference with GEFCS's relationship with havePOWER, havePOW-

ER does not sufficiently allege facts to meet the third element required for tortious interference with prospective advantage, or tortious interference with business relationships as it has come to be known. Therefore, Count II of the complaint is dismissed.

### B. Claims Against both GE and GEFCS

#### 1. Unreasonable Restraint of Trade—Violations of § 11–204(a)(1) of the Maryland Antitrust Act

 In order to sue under the antitrust laws, a plaintiff must first have standing under Md.Code Ann., Antitrust § 11–209(b)(2)(i) (1993).[4] Under federal law, in order to have standing, the plaintiff must allege that it has suffered an injury of the type that the antitrust laws were designed to prevent. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* Additionally, the plaintiff must meet the six factors set forth by the Supreme Court in *Associated General Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), in order to bring an antitrust action. These factors are:

(1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with

the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*The Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir.1999) (citing *Associated General*, 459 U.S. at 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). If the plaintiff does not meet any one of the six factors, the Supreme Court has held that the plaintiff's claim is insufficient as a matter of law and that the plaintiff is not a person injured by a violation of § 4 of the Clayton Act, the Federal antitrust statute. *Associated General*, 459 U.S. at 545–46, 103 S.Ct. 897. As a result of interpreting these factors, many courts have decided that "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *The Serpa Corp.*, 199 F.3d at 10–11. *See also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir.1995) ("[T]he distributors do not have standing to bring an antitrust claim against defendants because the distributors have not alleged an antitrust injury."); *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 45 (1st Cir. 1995) ("[C]ompetitors and consumers are favored plaintiffs in antitrust cases"); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir.1977) ("The terminations were an incidental matter which the merger may have made possible, but certainly did not cause.... This is insufficient to make out a case ... which is concerned with competition ...").

---

4. Maryland's Antitrust Act, states in § 11–202(a)(2) that the General Assembly intended that this state statute be interpreted by courts consistently with the federal courts' interpretation of federal antitrust statutes. Therefore,

this court shall first look to the federal standards. *See also Montgomery County Ass'n of Realtors v. Realty Photo Master Corp.*, 878 F.Supp. 804 (D.Md.1995).

Defendants argue that the injury suffered by havePOWER, namely that it did not become the exclusive distributor, servicer, and installer, is not an antitrust injury since it did not have an anticompetitive effect. Due to the fact that the result of the merger was the loss of an exclusive relationship and an offer of a non-exclusive distribution contract, Defendants argue there was actually a competitive effect from the merger. Additionally, other circuits have held that distributors may not sue under antitrust laws when they lose their distributorships as a result of mergers. *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1375 (11th Cir.1997); *See also G.K.A. Beverage Corp.*, 55 F.3d 762 (2d Cir.1995); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, (9th Cir. 1977). Therefore, Defendants argue that havePOWER has not suffered an antitrust injury and is not a proper plaintiff under § 11–204.

havePOWER responds that it should be allowed to sue since it is standing in the place of people who cannot sue for themselves and it is suing to assert injury caused by a conspiracy to eliminate horizontal competition. havePOWER states that Defendants seek to eliminate competition in three markets—distribution, installation, and service—which will affect consumers. Plaintiff relies primarily on a Ninth Circuit decision which held that consultants who offer advice to businesses on advertising effectively in the yellow pages are competitors with the publishers of the directories themselves, so the consultants were appropriate plaintiffs. *Yellow Pages Cost Consultants, Inc. v. GTE Directories, Inc.*, 951 F.2d 1158, 1161–62 (9th Cir.1991). That case differs substantially from the instant case, though, because havePOWER is not a direct competitor with GE in the fuel cell market. In addition, there is no reason the end-users of the fuel cells, the customers such as the Washoe tribe have-

POWER was negotiating with, cannot sue on their own. Nothing indicates that the end users are unable or unwilling to do so. Therefore, there is no justification for placing havePOWER "in the shoes of end users who cannot or will not sue." *The Serpa Corp. v. McWane, Inc.*, 14 F.Supp.2d 147, 152 (D.Mass.1998), *aff'd*, 199 F.3d 6 (1st Cir.1999). Therefore, because havePOWER lacks the standing to bring a claim for an antitrust violation under § 11–204 of the Maryland Antitrust Law and, as a result is not entitled to relief, Counts III and VIII against GE and GEFCS, respectively, are dismissed.

### C. Claims against General Electric Fuel Cell Systems ("GEFCS")

#### 1. Breach of written contract

havePOWER asserts in Count IV of its complaint that GEFCS breached the written contract between havePOWER and GEFCS when Robertson and Glickman represented to havePOWER executives that GE would not allow GEFCS to honor the contract due to GE's merger with Honeywell. Defendant GEFCS argues that this claim fails because the contract between GEFCS and havePOWER was never ratified. Both parties agree that GEFCS never returned an executed copy of the Distributor Agreement to havePOWER and that the check sent by havePOWER in compliance with the terms of the Agreement was never negotiated and was subsequently returned. The parties have agreed that New York law applies to the breach of contract and implied contract claims.

havePOWER asserts that New York case law holds that "[r]elevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party." *Consarc Corp. v. Marine Midland*

*Bank, N.A.,* 996 F.2d 568, 572 (2d Cir. 1993) (internal citations omitted). New York law states that "if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (citing *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493, 494 (1970)). However, this is not an iron clad rule, as "[i]t is important to commerce that the law make clear what force will be given to various expressions of intent .... Hard and fast requirements of form are out of place, of course." *Id.* at 74–75.

In the instant case, havePOWER adequately alleges facts as to the intent of the parties based on the negotiations that took place throughout 2000 to withstand a 12(b)(6) challenge. havePOWER's pleading is sufficient to state a claim that a contract did exist between havePOWER and GEFCS in the Distributor Agreement and that there was a breach when Robertson and Glickman stated that they were not going to honor it. havePOWER's claim of breach of written contract is sufficient to withstand a motion to dismiss. Therefore, Defendants' motion to dismiss Count IV of the Complaint is denied.

## 2. Breach of implied contract

havePOWER asserts in Count V of its Complaint that GEFCS breached an implied contract between havePOWER and GEFCS, which was created by GEFCS's conduct after August 17, 2000, when Robertson and Glickman stated that they would not honor the contract based on the merger of Honeywell with GE. GEFCS argues that an implied contract only exists when two parties fail to reduce an agreement to specific terms and it is clear the parties intended to be bound by an unwritten agreement. Paper No. 15, p. 21. It asserts that there was not an unwritten agreement, only a written agreement which was never ratified. havePOWER responds that it is premature to remove this cause of action, as it has not been determined that an express agreement existed that governed the parties' actions. Paper No. 14, pp. 29–30.

New York courts have stated the "the prerequisite for [an implied-in-fact] contract is that there be no express agreement dealing with the same subject matter." *Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 71 (S.D.N.Y.1988). "Where ... there is an express agreement covering the subject matter of the alleged implied-in-fact agreement, the implied-in-fact agreement is precluded as a matter of law." *Id.* (internal citations omitted). *See also Miller v. Schloss,* 218 N.Y. 400, 113 N.E. 337, 339 (1916) ("A contract cannot be implied in fact where ... there is an express contract covering the subject-matter involved").

As it is undisputed that the parties did draft an express agreement, the Distributor Agreement, the court cannot imply a contract in fact under New York state law. Although the plaintiff would like the court to infer an implied-in-fact contract based on GEFCS's conduct, it is impossible to do that because an express agreement was drafted between havePOWER and GEFCS. Therefore, Count V of the Complaint alleging breach of implied-in-fact contract against GEFCS is dismissed.

## 3. Promissory Estoppel

Count VI of havePOWER's complaint alleges that Robertson made representations to Zawatsky on August 17, 2000, that constituted a clear and definite promise that havePOWER reasonably relied upon. GEFCS responds that reliance upon verbal assurances was prohibited by the March 2000 Confidentiality Agreement

and that havePOWER's reliance was objectively unreasonable because Robertson lacked the authority to bind havePOWER.

The parties disagree as to whether New York or Maryland law should be applied. The elements of promissory estoppel are almost identical in the two states and the analysis yields the same result. Therefore, the court will apply Maryland law for the time being. Promissory estoppel has four elements under Maryland law:

> 1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forebearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co.,* 342 Md. 143, 674 A.2d 521 (1996) (quoting *Restatement (second) of Contracts* § 90(1) (1979)). GEFCS asserts that any reliance was unreasonable because Robertson did not have the authority to bind GEFCS. havePOWER responds, however, that it was entitled to rely on the representations of both Robertson and Glickman, the President of GEFCS and the designated signatory to the Distributor Agreement, who had represented to havePOWER that Robertson had the authority to bind GEFCS. Paper No. 14, p. 32. GEFCS argues that Robertson corrected himself twelve days after his representation on August 17th, so any reliance was minimal at best. GEFCS points to an e-mail from Zawatsky dated August 30, 2000 referencing a conversation the prior day as evidence that the representation was withdrawn. However, the e-mail only states that "your regional sales people want to change our distributorship". Paper No. 13, Ex. A. It does not refer to havePOWER not securing final distributor review and approval. Id. Further, according to havePOWER's allegations, GEFCS represented not only to it but to outside parties, such as the Washoe Indian Tribe, that it had a deal after August 29, by attending meetings with the Tribe and verbally representing that havePOWER was its fuel cell distributor. Specifically, on September 21, 2000 Robertson represented to Chairman Wallace of the Washoe Tribe that havePOWER was one of the exclusive distributors for GEFCS. Paper No. 2, ¶ 81–82.

These acts form the basis for reasonable action by havePOWER. The terms of the Distributor Agreement and the verbal representations made by Glickman and Robertson constitute an offer in which the promisor has a reasonable expectation that it will induce action. It was foreseeable that havePOWER would rely on Robertson and Glickman's representations regarding the status of the deal, particularly when GEFCS represented to a third party that havePOWER was an exclusive distributor. Therefore, havePOWER did not rely unreasonably upon GEFCS's assurances and Defendants' motion to dismiss Count VI of the Complaint is denied.

## IV. Conclusion

For the foregoing reasons, the Defendants' motion is denied in part as to the breach of express contract claim and the promissory estoppel claim, and granted in part as to all claims against GE and the antitrust claim against GEFCS.